UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PATRICIA KILBY-ROBB**,<br><br>Plaintiff,<br><br>v.<br><br>**ARNE DUNCAN**, Secretary, U.S. Department of Education,<br><br>Defendant. | Case No. 1:13-cv-978 (CRC) |

**MEMORANDUM OPINION**

Plaintiff Patricia Kilby-Robb alleges that during late 2010 and early 2011, her employer, the U.S. Department of Education ("DOE" or the "Department"), engaged in race- and age-based discrimination and retaliation, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-16(a), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 633a(a). She claims that the poor performance evaluation she received from the Department, as well as a number of measures taken by the Department in connection with her extended medical leave, were discriminatory and retaliatory in violation of law. The Court concludes that most of the personnel actions Kilby-Ross complains of are not materially adverse, and that legitimate, non-discriminatory reasons explain those that are. Consequently, the Court will grant summary judgment for the Department.

**I.    Background**

Kilby-Robb, an African-American over the age of sixty, has been employed since November 2009 as an Educational Program Specialist in the Charter Schools Programs office of the Department's Office of Innovation and Improvement ("OII"), which administers over two dozen discretionary grant programs for schools across the country. Def.'s Mot. Summ. J.

("MSJ"), Ex. 1; Ex. 2, at 56; Ex. 3, at 134–137.[1]  During the relevant time period, Kilby-Robb's immediate supervisor—and, allegedly, the one most directly responsible for the Department's adverse actions—was Scott Pearson, who became Acting Director of the Charter Schools Program in May 2010.  MSJ, Ex. 4, at 82.  Kilby-Robb's Complaint also more tangentially implicates Margo Anderson, her second-level supervisor; Nancy Paulu, who was the Coordinator for Fund for Improvement of Education ("FIE") grants and oversaw the work of all grant monitors (including Kilby-Robb) working in the Charter Schools Program; and Carol Lyons, who was a higher-level director within OII.  Ex. 5, at 93; Ex. 6, at 99; Ex. 7, at 106.

For a six-month period beginning in March 2010, soon after the start of her employment in the Charter Schools Programs office, Kilby-Robb was evaluated under the Education Department Performance Appraisal System ("EDPAS").  MSJ, Ex. 8, at 182–209; Ex. 9, at 127–28.  Under EDPAS, non-supervisory employees, including Kilby-Robb, are evaluated with respect to their "organizational priorities" and "customer service," on the following scale: 1 – "Unacceptable"; 2 – "Minimally Successful"; 3 – "Successful"; 4 – "Highly Successful"; and 5 – "Outstanding."  MSJ, Ex. 8, at 185, 206.  During the relevant evaluation period, Kilby-Robb's "organizational" responsibilities included such things as "complet[ing] required activities for awarding grants by adhering to the appropriate grant procedures, including reviewing applications . . . to assist with the timely and efficient preparation of grant slates for OII and Department approval."  MSJ, Ex. 10, at 129–30.  Grant applications were to be reviewed and processed within eight weeks.  MSJ, Ex. 7, at 107.  Kilby-Robb's "customer service"

---

[1] Certain exhibits attached to the Department's summary judgment motion derive from the Equal Employment Opportunity Commission's ("EEOC's") Report of Investigation ("ROI"), compiled in response to Kilby-Robb's corresponding administrative complaint.  For those exhibits, cited page numbers are those used in the ROI.

responsibilities included "[p]roviding sound and timely advice to assigned grantees and OII staff concerning project-related inquiries." Id. at 131.

During the evaluation period, Kilby-Robb was assigned twenty-five FIE applications to process; nineteen of those applications were not processed within the expected eight-week window. MSJ, Ex. 14. In May 2010, a grant applicant sent an email to the Department, complaining that Kilby-Robb had been nonresponsive to emails and phone calls, that the processing—not yet completed—had already taken fourteen weeks, and that without the grant funding, the applicant was "having to pay all expenses out of [her] savings and personal credit cards." MSJ, Ex. 12. The Department received a similar email in September from a grantee seeking approval for some proposed changes: He had sent a letter to Kilby-Robb in July, as well as multiple emails, but had not yet received a response. MSJ, Ex. 13. In October 2010, towards the end of the evaluation period, Pearson—who as Kilby-Robb's direct supervisor was charged with completing her assessment—asked Paulu, the FIE grants coordinator, for a summary of Kilby-Robb's work performance. MSJ, Ex. 15. Paulu catalogued specific examples of deadlines that were missed and "[i]mportant details [that] often were overlooked or ignored," noting that "far too often I was required to make major revisions to [Kilby-Robb's] work" and "in several cases take over all or parts of assignments for them to be completed at an acceptable professional level and on time." MSJ, Ex. 14. On October 25, 2016, after reviewing Paulu's account and consulting via email with other colleagues, Pearson assessed Kilby-Robb as "Minimally Successful," i.e., the second-lowest rating, on both her organizational and customer service performance. MSJ, Ex. 10, at 132; Ex. 15.

Several days after receiving this performance rating, Kilby-Robb took an extended medical leave; she was absent from October 29, 2010 through January 7, 2011. MSJ, Ex. 2.

3

During this time, she corresponded via email with Pearson and Paulu, performing some grant assistance work from home and forwarding other work to Paulu. MSJ, Exs. 11, 18–21. However, Kilby-Robb never communicated to the Department a date on which she would return to work. MSJ, Ex. 11, at 73–74. Most of Kilby-Robb's leave was approved under the Department's sick leave policy, which requires employees to complete a request and submit supporting medical documentation for absences longer than four days. MSJ, Ex. 17. However, Kilby-Robb's approved leave period expired at the end of December, and so on January 4, 2011, Pearson emailed her requesting that she submit a status update. MSJ, Ex. 22. Later that week, Kilby-Robb responded that she had made progress, had an upcoming appointment, and would "return to the Department after consultation with [her] medical team." Pl.'s Opp'n Def.'s MSJ ("Pl.'s Opp'n"), Ex. E. On January 10, in response to another email from Pearson reminding Kilby-Robb of the Department's leave policies and seeking documentation, she emailed to explain that as of that day, she would "not be on leave," but would work from home. MSJ, Ex. 23. The following day, Pearson responded with an email granting Kilby-Robb permission to work from home, but only for that week, and requesting the proper medical documentation for two absences in November as well as the first week in January. MSJ, Ex. 24.

Pearson and Kilby-Robb, joined by Paulu, spoke on the phone the following day, January 12, primarily to "review the status of [Kilby-Robb's] work," given that there was a significant backlog in the grants assigned to her for processing. MSJ, Ex. 4, at 84–85. During the call, Pearson asked about Kilby-Robb's health condition "in the context of understanding when she would return to the office," but when Kilby-Robb responded that she felt such questions to be inappropriate—since Paulu was not her direct supervisor—Pearson stopped asking health-related questions. Id. at 85. Pearson later explained that, after discussing the issue with the

Department's Human Resources office, he had concluded that it was "appropriate" for Paulu to meet with him and Kilby-Robb "when . . . discussing the content of [Kilby-Robb's] work on FIE [grants]," but that it was "not appropriate when . . . discussing broader personnel issues." Pls.' Opp'n, Ex. I. On January 14, still lacking the proper documentation for Kilby-Robb's early-January absences, Pearson marked her as being absent without leave ("AWOL") on those dates. MSJ, Ex. 25.

About a week later, on January 18, Kilby-Robb returned to the office, and Pearson and Paulu met with her in person. MSJ, Ex. 28. Pearson had asked Paulu to join the meeting because she had been involved in coordinating, and partially shouldering, Kilby-Robb's workload in her absence. MSJ, Ex. 4, at 84–85; Ex. 6, at 100–01. But when Kilby-Robb objected to Paulu's presence at the meeting, Pearson asked Paulu to leave. MSJ, Ex. 6, at 101. During the meeting, Pearson gave Plaintiff a "Conduct Note for the File," which flagged multiple leave dates—two in November, plus the first week in January—for which Kilby-Robb had provided no proper medical documentation. MSJ, Ex. 30. Ultimately, Pearson rescinded the "Conduct Note," but on February 1, 2011, he wrote a "Counseling Memorandum" to Kilby-Robb, in which he described concerns regarding her lack of preparation for the January 18 meeting and her failure to provide leave requests for early January. MSJ, Ex. 28. On February 3, in light of medical documentation submitted by Kilby-Robb on January 31, Pearson voided the AWOL designation. MSJ, Ex. 27.

Kilby-Robb brought this action in June 2013, alleging race discrimination under Title VII ("Count I"); retaliation under Title VII ("Count II"); and age discrimination under the ADEA

("Count III").[2] Moreover, Kilby-Robb alleged in each count that the Department had "created a hostile work environment."[3] Am. Compl. ¶¶ 26, 32, 28. All supposed legal violations were founded on the same purported misconduct: Kilby-Robb alleged that the Department discriminated and retaliated against her "by issuing her a low performance evaluation; coercing her into providing confidential medical information; charging her thirty-two hours AWOL; having Paulu participate in discussions regarding her performance and medical condition; harassing her about her medical leave and documentation; [and] issuing her a Memorandum of Counseling." Id.[4]

Following discovery, the Department moved for summary judgment, arguing that "aside from her conclusory assertions of discriminatory intent and retaliatory animus, [Kilby-Robb] is unable to show that Mr. Pearson's actions were based on reasons that were other than legitimate and non-discriminatory," and that she had been "unable to show . . . any connection between the alleged actions and Ms. Anderson or Ms. Paulu." Def.'s Mem. Supp. MSJ 2. Resting primarily on her own affidavit, Kilby-Robb contends in her Opposition that she has put forth direct evidence of discriminatory intent, and has "demonstrated that each of the [Department's]

---

[2] Kilby-Robb is no stranger to the District Court, having filed—in addition to the instant action—four other complaints against the Department stemming from various personnel actions involving numerous supervisors and colleagues. See Kilby-Robb v. Duncan, Case No. 14-cv-2200 (D.D.C. filed Dec. 26, 2014); Kilby-Robb v. Duncan, Case No. 13-cv-718 (D.D.C. filed May 13, 2013); Kilby-Robb v. Duncan, 77 F. Supp. 3d 164 (D.D.C. 2015); Kilby-Robb v. Spellings, 522 F. Supp. 2d 148 (D.D.C. 2007), aff'd, 309 F. App'x 422 (D.C. Cir. 2009).

[3] Kilby-Robb does not identify a hostile work environment claim as a separate count, but the Court will nevertheless analyze that claim separately. See infra section III.C.

[4] Kilby-Robb also alleged that Pearson had left "her confidential medical and personnel records unattended on the copier," Am. Compl. ¶¶ 21, 26, 32, 28, a claim the Court addresses briefly below. See infra section III.A.5.

justifications for its acts is false and [a] pretext for unlawful discrimination." Pl.'s Opp'n 2. The Department filed a Reply, and the Motion is ripe for consideration.

## II.  Legal Standards

The Court will grant summary judgment if the movant "shows that there is no genuine dispute as to any material fact," such that "judgment as a matter of law" is proper. Fed. R. Civ. P. 56(a). The movant has the burden of showing the "absence of a genuine issue of material fact" in dispute, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and the Court accepts as true the nonmovant's evidence, drawing all reasonable inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). On the other hand, the nonmovant may not rely on mere allegations or conclusory statements. Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006). The Court is "most likely" to grant summary judgment in favor of a defendant "when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements." Mokhtar v. Kerry, 83 F. Supp. 3d 49, 61 (D.D.C. 2015) (quoting Bonieskie v. Mukasey, 540 F. Supp. 2d 190, 195 (D.D.C. 2008)).

## III.  Analysis

As enumerated above, Kilby-Robb brings claims of discrimination, retaliation, and— under a liberal reading of her Complaint—hostile work environment. The Court will discuss each claim separately.

### A. Race and Age Discrimination

Kilby-Robb alleges that the Department subjected her to discrimination based on her race in violation of Title VII and based on her age in violation of the ADEA. Under both Title VII and the ADEA, since she is undisputedly a member of the relevant protected classes, Kilby-Robb must establish a *prima facie* case that she "(i) . . . suffered an adverse employment action (ii)

because of [her] race [or] age[.]" Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (citing 42 U.S.C. § 2000e-16(a); 29 U.S.C. §§ 621 *et seq.*).[5]

To be materially adverse, an employment action need not result in a loss of salary or grade level.  See id. (citing Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007).  However, in the context of a discrimination claim, it must entail "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Baird v. Gotbaum, 662 F.3d 1246, 1249 (D.C. Cir. 2011) (citing Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009)) (internal quotation marks omitted).  In other words, a plaintiff must show that an action led to "objectively tangible harm." Briscoe v. Kerry, 111 F. Supp. 3d 46, 544 (D.D.C. 2015) (quoting Doe v. Gates, 828 F. Supp. 2d 266, 270 (D.D.C. 2011)) (internal quotation marks omitted).

Under the familiar framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), once a plaintiff has presented a *prima facie* case of discrimination by establishing an adverse action caused by a protected characteristic such as race or age, the burden

---

[5] Kilby-Robb argues that certain "negative comments [made by Department employees] about African American employees" and comments to the effect that it was a "department priority" to "bring[] in younger employees" are "*direct* evidence of discrimination."  Pl.'s Opp'n 2 (emphasis added).  They are not.  "To qualify as direct evidence, a statement or remark must '*itself* show[ ] . . . bias in the employment decision.'"  Conn v. Am. Nat'l Red Cross, 149 F. Supp. 3d 136, 146 (D.D.C. 2016) (quoting Wilson v. Cox, 753 F.3d 244, 247 (D.C. Cir. 2014)); see also Wicks v. American Transmission Co., 701 F. Supp. 2d 38, 44 (D.D.C. 2010) ("[D]irect evidence does not include stray remarks in the workplace, particularly those . . . statements made by decision makers unrelated to the decisional process itself.") (citing Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 96 (1st Cir. 1996)) (internal quotation marks removed).  Leaving aside the fact that Kilby-Robb supports none of her allegations with citations beyond the statements in her own affidavit, none of these alleged discriminatory comments have relevance to any of the purported adverse employment actions taken by the Department.  Consequently, Kilby-Robb has produced at most *circumstantial* evidence in support of her claims.

shifts to the employer to assert a legitimate, non-discriminatory reason for its action. See Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). At that point, courts at the summary judgment stage "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" Id.; see also Stella v. Mineta, 284 F.3d 135, 144 (D.C. Cir. 2002) (noting that to sustain a discrimination claim, "[t]he plaintiff must . . . demonstrate that the employer's stated reason was pretextual and that the true reason was discriminatory").

Kilby-Robb asserts multiple adverse actions to support her discrimination claim: her "Minimally Successful" performance rating; her temporary AWOL status; her conduct note and counseling memorandum; Ms. Paulu's participation in her conversations with Mr. Pearson; and her personnel record being left on the copier. The Court will determine whether these employment actions were cognizably adverse, and, if they were, whether Kilby-Robb has adduced sufficient evidence to cast genuine doubt on the Department's stated legitimate, non-discriminatory reasons for its actions.

1. "Minimally Successful" Performance Rating

The Department does not deny that Kilby-Robb's 2010 performance evaluation constituted an adverse action. See Def.'s Reply 11 n.2. Because Kilby-Robb's "minimally successful" rating prevented her from being eligible for annual bonuses, this action affected "the terms, conditions, or privileges of employment or future employment," and so was materially adverse. See Briscoe, 111 F. Supp. 3d at 544 (quoting Doe, 828 F. Supp. 2d at 270) (internal quotation marks omitted). Thus, the analysis turns on whether there is sufficient evidence

9

showing that the Department's stated reasons for the action were legitimate and non-discriminatory rather than pretextual.

The Department's reason for giving Kilby-Robb the rating that it did was that during the 2010 evaluation period, "her work was often late, error-filled, and required an unusual and disproportionate degree of revision and intervention by the CSP FIE Coordinator." Def.'s Mem. Support MSJ 6. That rationale is backed up by copious record evidence, including detailed, contemporaneous emails from Kilby-Robb's colleagues, and emails from third-party grant applicants complaining of nonresponsive service. See MSJ, Exs. 12–15. Those emails establish that the vast majority of Kilby-Robb's grants were processed behind schedule, that Kilby-Robb repeatedly ignored calls and emails from grant applicants, and that Kilby-Robb's work was filled with errors. Id. In other words, the record fully supports the conclusion that the "Minimally Successful" rating was legitimate and nondiscriminatory because it was accurate. See MSJ, Ex. 8 at 208 (describing a "Minimally Successful" rating under the EDPAS system as applying where an "employee usually completes assigned tasks but they are frequently late and occasionally not in accordance with established procedures" and "[t]he supervisor frequently has to correct substantive portions of the employee's work products").

On the other side of the scale, Kilby-Robb offers no solid evidence undermining the Department's legitimate explanation for its rating. Kilby-Robb maintains that the deficiencies and complaints on which Mr. Pearson based the rating were all false, insisting that the "2010 performance rating consisted entirely of fabrications and distortions about [her] performance." Pl.'s Opp'n 8. But she fails to support this claim with *evidence*—aside from the self-serving allegations in her own affidavit. Even if the Court accepts as true some of Kilby-Robb's more specific assertions, those claims merely nibble at the margins of the Department's supporting

evidence, leaving most of it uncontradicted.  For example, Kilby-Robb attempts to explain away one of the grantee emails complaining that she was being nonresponsive by citing to her own email stating that she received only one missed call from the grantee.  See Pl.'s Opp'n, Ex. C. But Kilby-Robb fails to address the grantee's contention that she failed to respond to his emails, or the fact that, as of September, she had not responded to the grantee's July letter. In short, Kilby-Robb's conclusory assertions and piecemeal refutations cannot make it a matter of "genuine dispute" that the Department's proffered reasons for her low performance rating were pretextual, rather than a legitimate reflection of the quality of her work.  "[A]n employee's mere disagreement with her performance evaluation does not prove pretext."  Ramseur v. Perez, 80 F. Supp. 3d 58, 74 (D.D.C. 2015) (citation omitted).

    2.  AWOL Charge

Kilby-Robb contends that the Department's temporarily designating her as AWOL was an adverse action and the Department's stated reason for doing so was pretextual.  Although the AWOL charge lasted for a short time and was eventually reversed, there remains the possibility that the action was adverse due to the temporary withholding of wages.  The D.C. Circuit has held that "a suspension without pay, even where an employer later provided back pay, could be 'a serious hardship' to a reasonable employee, and thus 'materially adverse.'"  Greer v. Paulson, 505 F.3d 1306, 1318 (D.C. Cir. 2007) (citing Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53); see also Taylor v. Solis, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (finding plaintiff's "temporary deprivation of wages counts as a materially adverse action" when plaintiff was listed as AWOL for one week).  Because Kilby-Robb was temporarily denied pay for the brief period that she was on AWOL status, the Court will assume for the sake of argument she suffered a materially adverse action.

Even under that assumption, however, Kilby-Robb's claim lacks merit.  The Department's proffered reason for placing her on AWOL—i.e., that she failed to provide the proper documentation for her absences—is undoubtedly legitimate.  See Nurriddin v. Bolden, 40 F. Supp. 3d 104, 129–30 (D.D.C. 2014) (holding that the failure to provide sufficient medical documentation for leave requests was a legitimate, nondiscriminatory reason for placing an employee on AWOL status).  And Kilby-Robb has brought forth no evidence that would cast genuine doubt on that stated rationale.  The Department's sick leave policy requires that sick leave requests for more than four days require a medical certificate or other supporting documentation.  MSJ, Ex. 17.  Mr. Pearson complied with that policy, requesting documentation that Kilby-Robb was unable to work due to her medical condition during the week of January 3, 2011, and temporarily charging Kilby-Robb with AWOL when he did not receive that documentation.  MSJ, Exs. 22, 25.  When Kilby-Robb did submit the appropriate documentation, on January 31, he voided the AWOL charge.  MSJ, Ex. 27.  One doctor's note Kilby-Robb submitted on January 7 documented a single medical appointment on that particular date, but nothing submitted before January 31 said anything about her being unable to work during the relevant period.  See Pl.'s Opp'n, Ex. M.  Consequently, Kilby-Robb's attempt to show that the Department's reason for placing her on AWOL was pretextual is not supported by sufficient evidence.  The Court will therefore grant summary judgment for the Department on this claim.

### 3.  Conduct Notes and Counseling Memorandum

Kilby-Robb next challenges as discriminatory the Department's issuance to her of a conduct note and counseling memorandum.  These actions were not materially adverse, and in any event, reflected legitimate, nondiscriminatory considerations.

"A letter of counseling, written reprimand, or unsatisfactory performance review, if not abusive in tone or language or a predicate for a more tangible form of adverse action, will rarely constitute materially adverse action." Hyson v. Architect of Capitol, 802 F.Supp.2d 84, 102 (D.D.C. 2011). Job-related, constructive criticism that encourages improved performance by an employee does not rise to the level of materially adverse action. See Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir. 2009). A change in pay, grade, or working conditions, on the other hand, provides an evidentiary basis upon which to prove a materially adverse action occurred in the workplace. See Herbert v. Architect of Capitol, 766 F. Supp. 2d 59, 75 (D.D.C. 2011).

Kilby-Robb argues that the note and memorandum negatively affected her wages and promotional opportunities. Pl.'s Opp'n 18. But neither resulted in any tangible harm, such as a pay deduction or unfavorable change in job status. The note was rescinded on January 20, 2011, shortly after it was drawn up. MSJ, Ex. 33. The memorandum, while not formally rescinded, stated that it was "not a disciplinary action" and "[would] not be placed in [Kilby-Robb's] personal folder." MSJ, Ex. 28. Instead, it warned: "any *future* misconduct could result in the initiation of disciplinary action." Id. In addition, Kilby-Robb contends that she was denied a merit promotion in September 2011, less than a year after receiving the note and memorandum, Pl.'s Opp'n 18, but even assuming the promotion was denied, any connection between the two events is entirely unsubstantiated. Finally, even if the counseling memorandum were assumed to be an adverse action, the concerns it describes are supported by uncontradicted evidence in the record, and so there is no evidence casting genuine doubt on legitimacy of Pearson's reasons for issuing it. The Department is therefore entitled to summary judgment on this issue.

### 4. Paulu's Participation in Certain Conversations

Kilby-Robb alleges that Paulu's involvement in discussions with Pearson and herself about her work performance and medical issues also constituted illegal discrimination. Kilby-Robb contends that Paulu's participation in the January 12 and January 18, 2011 discussions "materially affected" the "conditions and privileges of her employment." Pl.'s Opp'n 19. Yet, once again, she fails to back that assertion with evidence. Rather, the record shows that, during both discussions, once Kilby-Robb made her objections to Paulu's participation known, Pearson either limited the content of the discussion to only work-related questions or asked Paulu to leave. MSJ, Exs. 4, 6. Even assuming *arguendo* that Paulu's participation in the discussions did constitute an adverse action, this claim would still fail because her involvement was based on a legitimate, nondiscriminatory reason. While Kilby-Robb was out on sick leave, she discussed her work assignments with Paulu, MSJ, Ex. 11, at 72–73, and Paulu had been responsible for handling her grants during her absence, MSJ, Ex. 2, at 84–85, 87. Paulu's participation in these discussions, which related directly to Kilby-Robb's work, was therefore legitimate. Without any evidence showing that Paulu's participation in the conversations was either materially adverse or illegitimate, summary judgment for the Department is warranted on this claim.

### 5. Personnel Records Left on the Photocopier

Positing a final purported instance of discriminatory action, Kilby-Robb contends that Pearson left her personnel records, including confidential medical information, on the workplace photocopier. But, to continue a familiar theme, Kilby-Robb provides no evidence showing that this action was either materially adverse or discriminatory. The Court will therefore grant summary judgment on this issue.

### B. Retaliation

In addition to her discrimination claims, Kilby-Robb also alleges that the above actions were undertaken in retaliation for her previous complaints of employment discrimination. "To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there existed a causal connection between the protected activity and the materially adverse action." Na'im v. Clinton, 626 F. Supp. 2d 63, 76 (D.D.C. 2009) (footnote omitted) (citing Burlington N., 548 U.S. at 67-69). Once a *prima facie* case is established, the employer must show a legitimate, non-retaliatory reason for its actions. Id. at 76 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)). As compared to claims of pure discrimination, the universe of adverse actions is larger in the retaliation context. See Baloch, 550 F.3d at 1198 n.4 (quoting Burlington N., 548 U.S. at 64–68). Retaliatory adverse actions are "not limited to discriminatory actions that affect the terms and conditions of employment," id., but rather include any actions that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Douglas-Slade v. LaHood, 793 F. Supp. 2d 82, 98 (D.D.C. 2011).

Even assuming that the above-described actions were adverse under this more lenient standard, Kilby-Robb has nevertheless failed to establish a causal connection between the alleged protected activity and those actions. To demonstrate a causal connection, a plaintiff must show "but for" causation, or "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013). That causal link can be established by temporal proximity between the protected activity and the alleged adverse act, but "[t]he cases that accept

mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close.'" Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).  Here, more than a year passed between Kilby-Robb's prior EEOC activity, which occurred in mid-2009, and her negative performance review in October 2010, which is the first adverse action she alleges.  MSJ, Ex. 2, at 56.  Similarly, Pearson learned of Kilby-Robb's prior EEOC complaint—which raised allegations against a different supervisor—in May 2010, about five months before any alleged adverse action.  MSJ, Ex. 4, at 83.  Where the relevant events are separated by a half-year to a year, more is needed to establish that the protected activity was a but-for cause of the asserted adverse action.  See Breeden, 532 U.S. at 273 (citing favorably federal appellate decisions deeming 3-month and 4-month periods of proximity to be insufficient for establishing causality).

 Furthermore, even if the Court assumes Kilby-Robb has established the requisite causality, Kilby-Robb has not shown that the various justifications proffered by the Department for its actions were pretextual, meaning that Kilby-Robb is not entitled to a presumption in her favor *even if* she were to meet the elements for a *prima facie* case of retaliation.  See Peters v. District of Columbia, 873 F. Supp. 2d 158, 201 (D.D.C. 2012) ("A dismissal may . . . be warranted if the defendant shows a legitimate, non-discriminatory reason for its actions [which] breaks the causal connection between the first two elements and defeats a retaliation claim.").

 Consequently, the Court will grant summary judgment for the Department on Kilby-Robb's retaliation claim.

    C.  Hostile Work Environment

Kilby-Robb contends that the Department's actions allegedly subjecting her to race discrimination, age discrimination, and retaliation, also constituted a hostile work environment. To prevail on a hostile work environment claim, "a plaintiff must show that his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (internal quotations and citations omitted). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Id. The acts giving rise to a hostile work environment claim must be sufficiently severe or pervasive, and must be adequately connected to each other. Baird v. Gotbaum, 662 F.3d 1246, 1252 (D.C. Cir. 2011). No matter how "unjustified or egregious" the hostile behavior is, there must also be "some linkage between the hostile behavior and the plaintiff's membership in a protected class" for a claim to be supported. Na'im, 626 F. Supp. 2d at 73 (internal citations omitted). "[T]he removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context." Nurriddin v. Bolden, 674 F. Supp. 2d 64, 94 (D.D.C. 2009).

Kilby-Robb's allegation that the defendants subjected her to a hostile work environment rests on the same purportedly adverse actions described above. Clearly, even if Kilby-Robb had produced sufficient evidence that these alleged actions were race- or age-based, which she has not, none of these instances rise to the "severe" and "pervasive" level of seriousness necessary

17

for a hostile work environment claim.  The alleged adverse actions were either justified work performance evaluations, or they were supervisory reactions to Kilby-Robb's medical leave and delayed compliance with office policy.  Other than the AWOL charge, which was later corrected, neither is Kilby-Robb's claim supported by evidence of tangible harm in the workplace.  In short, nothing in this record permits Kilby-Robb to survive summary judgment on her hostile work environment claim.

### IV.     Conclusion

For the reasons outlined above, the Court will grant the Department's Motion for Summary Judgment.  An appropriate Order accompanies this Memorandum Opinion.

*Christopher R. Cooper*
CHRISTOPHER R. COOPER
United States District Judge

Date: September 28, 2016